UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KELLEY A. TIMPF,

       Plaintiff,                          Civil Action No. 07-12666

v.                                  HON.  BERNARD A. FRIEDMAN
                                   U.S. District Judge
                                   HON. R.  STEVEN WHALEN
COMMISSIONER OF SOCIAL         U.S. Magistrate Judge
SECURITY,

       Defendant.

_____/

## REPORT AND RECOMMENDATION

Plaintiff Kelley Timpf brings this action under 42 U.S.C. §405(g), challenging a final decision of Defendant Commissioner denying her application for disability and disability insurance benefits ("DIB")under the Social Security Act.  Both parties have filed summary judgment motions which have been referred for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).   I recommend that Defendant's Motion for Summary Judgment be DENIED, and that Plaintiff's Motion for Summary Judgment be GRANTED, remanding this case for an award of benefits.

## PROCEDURAL HISTORY

On June 23, 2003 Plaintiff filed an application for DIB,  alleging an onset of disability date of November 22, 2002 (Tr. 13).  After denial of her initial claim, Plaintiff filed a timely request for an administrative hearing, held February 1, 2005 by video conference between

Detroit, Michigan and Evanston, Illinois[1] (Tr. 319). Plaintiff, represented by attorney Robert Samoray, testified (Tr. 323-339). Dr. Mark Oberlander testified, as did vocational expert ("VE") Allen Searles (Tr. 339-346, 346-349). On October 31, 2006, ALJ Maren Dougherty found that although Plaintiff was unable to perform her past relevant work, she retained the ability to perform a significant range of sedentary work (Tr. 22). On April 25, 2007 the Appeals Council denied review (Tr. 5-7). Plaintiff filed for judicial review of the final decision on June 22, 2007.

## BACKGROUND FACTS

Plaintiff, born March 11, 1971, was age 35 when the ALJ issued his decision (Tr. 22, 323). She alleges disability due to hip and leg injuries that resulted from an accident (Tr. 117, 163). Plaintiff completed 10th grade and worked previously as a housekeeper and janitor (Tr. 118, 123).

### A. Plaintiff's Testimony

Plaintiff testified that she stood 5' 2" and weighed 79 pounds, reporting that she had recently experienced a rapid weight loss (Tr. 323). She alleged constant pain as a result of a hip and left femur fracture, adding that she required the use of a walker (Tr. 324). She estimated that she could stand comfortably for 10 to 12 minutes before her legs "gave out," adding that she could sit in a reclining chair for up to 40 minutes (Tr. 325). She testified that

---

[1]

The administrative hearing, originally scheduled for September 30, 2004, was adjourned so Plaintiff could undergo a consultive neurological examination prior to testifying (Tr. 313).

pain obliged her to lie down for two to three hours multiple times each day and interrupted her sleeping patterns (Tr. 325-326). She indicated that she was able to perform simple food preparation and cleanup chores (Tr. 327). She alleged that two to three times each week pain left her completely bedridden, and attributed her "bad days" to overexertion (Tr. 327).

Plaintiff, reporting that she lived by herself in a trailer park, indicated that she left school after 10th grade (Tr. 329). She attributed her weight loss to the accident, adding that sitting in a vehicle for any length of time created discomfort (Tr. 329). Plaintiff a non-driver, testified that she worked formerly as a housekeeper, office cleaner, and home health aide, ceasing all work three years before the hearing (Tr. 330).

In addition to hip and leg pain, Plaintiff reported that she experienced muscle tremors and that her left foot regularly swelled up, resulting in infection (Tr. 332). She stated that she fell between one and three times each day (Tr. 334). Plaintiff indicated that she had been seeing a psychiatrist for approximately three months, adding that she had previously undergone counseling once a week for six months (Tr. 334). She stated that she currently took Effexor and Seroquel, indicating that the medication partially relieved symptoms of depression which included crying spells (Tr. 335, 338). In addition, Plaintiff reported taking over the counter pain medication as well as Neloxicam, which had been prescribed by her neurologist (Tr. 336). She indicated that she was leery of prescription pain killers, testifying that she took them only when the pain became "unbearable" (Tr. 336).

Plaintiff testified that spent a typical day watching television and reading, adding that she enjoyed magazines, fiction, and biographies, but her ability to read was compromised by

severe headaches (Tr. 337). She also alleged that concentrational difficulties prevented her from "tracking" television programs (Tr. 337-338). Plaintiff denied difficulty getting along with others (Tr. 338). She indicated that she never shopped for groceries, but instead relied on family members to bring her food (Tr. 339).

### B.    Medical Evidence

### 1. Treating Sources

In November, 2002, Plaintiff sustained a hip and left femur fracture after falling from a counter top (Tr. 163). The same month, Plaintiff underwent fracture reduction surgery along with the insertion of a pin and other hardware (Tr. 167). In February, 2003, Joseph C. Finch, D.O., noting that Plaintiff still experienced pain, an antalgic gait and mild left foot swelling, prescribed antibiotics (Tr. 176). In March, 2003, a bone scan showed "[i]ncreased activity involving the right knee . . . likely due to old injury, degenerative disease or bursitis" (Tr. 180). The scan also indicated "slight diffuse increased activity involving the left lower extremity comparing to the right, like due to reflex sympathetic dystrophy" (Tr. 180). In May, 2003, Dr. Finch observed that Plaintiff was progressing, noting that she was "getting stronger," but continued to experience ongoing discomfort (Tr. 173).

In August, 2003, Neurologist Sonia Fernando, M.D., noting that Plaintiff's last exam had occurred in October, 2002, found that a neurologic examination "was significant for tremors of the head, mouth, and outstretched arms" (Tr. 181). Dr. Fernando noted further that although an MRI of the brain, an EEG, and spinal tap showed normal results, Plaintiff's diagnosis was "possible Multiple Sclerosis" (Tr. 181, 268-269). Dr. Fernando reported that

she had prescribed Neurontin for "pins and needles paresthesias all over [Plaintiff's] body" and Ativan for anxiety (Tr. 181). In September, 2004, Dr. Fernando elaborated on her Plaintiff's condition as of October, 2002:

> "My impression at that time given her age and the progressive nature of her tremors and dysequilibrium was a demyelinating disease like Multiple Sclerosis. The other possibility was an anxiety disorder given her family history . . . . On September 3, 2002 (after being lost to follow-up for 14 months) she informed me that she had been falling a lot . . . I am afraid I do not know her current condition"

(Tr. 217-218 *see also* 262-267). Dr. Fernando opined that "[a]s of October 29, 2002, she was not disabled from her work cleaning homes" (Tr. 218).

In July, 2004, therapy notes indicate that Plaintiff reported depression and anxiety as a result of pain and other limitations created by her physical problems (Tr. 225). In November, 2004 therapist David J. Walker reported that Plaintiff was undergoing treatment by a psychiatrist as well as therapy, noting that she had been prescribed Effexor and Seroquel for anxiety and depression (Tr. 229). Treating notes from the same period by Wolfgang May, M.D., show that Plaintiff first experienced depression as a teenager and made two suicide attempts in her 20s (Tr. 231, 253). He assigned Plaintiff a GAF of 56[2] (Tr. 233). In January, 2005 Plaintiff was assigned a GAF of 57 (Tr. 234). The following month, Plaintiff was evaluated for anorexia after continuing to lose weight (Tr. 249, 251). In May,

---

[2]

A GAF score of 51-60 indicates moderate symptoms (occasional panic attacks) or moderate difficulty in social, occupational, or school functioning. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders--Text Revision* at 34 (*DSM-IV-TR* ) (4th ed.2000).

2005, Dr. May assigned Plaintiff a GAF of 65[3] (Tr. 296).

In November, 2004, Dr. Finch again evaluated Plaintiff's hip and leg condition, noting that she experienced crepitation and tenderness (Tr. 258). He advised removing the hardware that was implanted in her hip at the time of surgery "as soon as possible" (Tr. 258). He noted that Plaintiff did not have medical insurance (Tr. 258). In February, 2005, Dr. Finch found that "unfortunately she has had disability because of the continued pain she has had in her hip" (Tr. 259). He opined that Plaintiff would require a bone graft as well as the hardware removal (Tr. 259).

### 2. Consultive Sources and Non-Examining Sources

In September, 2003, Plaintiff underwent a consultive physical examination on behalf of the SSA. Erwin Pear, M.D., finding a history of a November, 2002 fall resulting in a broken hip and left femur, noted that Plaintiff complained of headaches and poor balance (Tr. 187). He observed that Plaintiff "obviously is having some trouble with equilibrium and touches and holds to the wall," noting further that she fidgeted "constantly" during her exam (Tr. 188). Finding Plaintiff "emotionally unstable," he noted that Plaintiff was able to walk only a quarter of a block, stand for 10-12 minutes, and sit for a maximum of 15 minutes (Tr.

---

[3]

GAF scores in the range of 61-70 indicate "some mild symptoms [of depression] or some difficulty in social, occupational, or school functioning." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders--Text Revision* at 32 (*DSM-IV-TR* ), 30 (4th ed.2000). However, again, the undersigned notes that Dr. Jabeen's assessments contradict his therapist's December, 2005 discharge assessment finding a GAF of 50 (Tr. 318).

189). He found that Plaintiff had received "only a limited amount of physiotherapy secondary to lack of insurance" (Tr. 189).

In October, 2003, a psychiatric evaluation by A. Shah, M.D., recording that Plaintiff reported a history of tremors, noted that Plaintiff sustained hip and femur fractures in a November, 2002 fall (Tr. 183). Plaintiff reported multiple depressive episodes each week, characterized by feelings of hopelessness (Tr. 183). Plaintiff also indicated that she had experienced anxiety for the past three or four years which was exacerbated by stress or being in a crowd (Tr. 183). Dr. Shah noted that after cutting her wrists several years earlier, Plaintiff was hospitalized for 30 days at Oakwood (Tr. 154). Dr. Shah found that Plaintiff had "good contact with reality," but "low self-esteem" (Tr. 185). He assigned Plaintiff a GAF of 45 with a "fair" prognosis[4] (Tr. 185).

In November, 2003 a Psychiatric Review Technique found that Plaintiff experienced both affective and anxiety-related disorders (Tr. 190, 193, 195). The review found further that her restrictions of activities of daily living; maintaining social functioning; and maintaining concentration, persistence, or pace were *moderately* limited but that Plaintiff had not experienced episodes of decompensation (Tr. 200-201). Noting "no evidence of psychosis," the review concluded that Plaintiff's activities of daily living ("ADLs") were

---

[4]

A GAF score of 41-50 indicates "[s]erious symptoms ... [or] serious impairment in social, occupational, or school functioning," such as inability to keep a job. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders--Text Revision*, 34 (*DSM-IV-TR* ) (4th ed.2000)

limited "primarily due to physical restrictions" (Tr. 202). The same month, a Mental Residual Functional Capacity Assessment found that Plaintiff's ability to carry out detailed instructions; maintain attention and concentration for extended periods; interact appropriately with the general public; and the ability to set realistic goals or make plans independently of others were *moderately* limited (Tr. 204-205). The assessment, noting that Plaintiff did not claim a mental impairment, found that she retained the capacity to perform "simple work activities on a sustained basis" (Tr. 207).

The following month, a Physical Residual Functional Capacity Assessment determined that Plaintiff was capable of lifting 20 pounds occasionally and 10 pounds frequently; the ability to stand and walk for at least 2 hours in an eight-hour workday; sit for six hours; and an unlimited ability to push and pull in all extremities (Tr. 210). The assessment limited Plaintiff to *occasional* climbing, balancing, stooping, kneeling, crouching, and crawling, but the complete absence of manipulative, visual, communicative, or environmental limitations (Tr. 212-213). A neurological evaluation performed in November, 2004 noted that Plaintiff had previously tested negative for Multiple Sclerosis (Tr. 219). Shyam S. Moudgil, M.D., acknowledging physical limitations as a result of hip and leg injuries, noted "fine postural tremors," and an "antalgic gait with a limp on left" (Tr. 220). He concluded that from "the neurological perspective, she doesn't have any disability" (Tr. 220). He found that Plaintiff experienced neither exertional nor non-exertional limitations (Tr. 221-224).

### 3. Hearing Testimony by Medical Expert

Relying primarily on Plaintiff's testimony, Dr. Mark Oberlander found that she experienced an affective disorder (depression) and anxiety, finding that her mental impairments were "secondary to the pain issues" (Tr. 342-343). Noting that Plaintiff was prescribed Xanax following January, 2003 surgery, Dr Oberlander postulated that "Xanax was prescribed both as a way of trying to reduce the post-surgical anxiety, as well as a possible aid in pain management" (Tr. 344). Dr. Oberlander noted the absence of "psychiatric contact" until July, 2004 (Tr. 344).

Concurring with the Psychiatric Review Technique, Dr. Oberlander found that Plaintiff experienced *moderate* restrictions of activities of daily living; social functioning; and maintaining concentration, persistence, and pace (Tr. 344). Next, referring to the Mental Residual Functional Capacity, he concluded that Plaintiff retained the ability to perform simple, unskilled work excluding her physical impairments (Tr. 345).

### C.    Vocational Expert Testimony

VE Allen Searles classified Plaintiff's former work as a home health aide as unskilled at the light exertional level and the janitorial cleaning as unskilled at the medium level of exertion (Tr. 347). The ALJ then posed the following question to the VE:

> "Taking someone of Ms. Timpf's age, which is range from 31 to 33, tenth-grade education, work experience as you've described it. Who is limited to sedentary work that does not require more than occasional postural activities such as kneeling, crawling, et cetera. Does not require any work that requires balance, and is limited to unskilled job tasks. Is there any work such a person like that can perform?"

(Tr. 347). The VE stated that such an individual could perform the work of an electronics

-9-

assembler, Dictionary of Occupational Titles ("DOT") number 726.684-010, finding the existence of 690,655 such jobs in the State of Michigan, along with 289,529 surveillance system monitor positions (DOT no. 379.367-010) and 690,655 cutter, paster positions (DOT 249.587-014) (Tr. 348). The VE added that the above jobs contained a sit/stand option based on the ability to walk up to a block (Tr. 348). He testified that if the hypothetical individual were limited to walking 15 feet, she would be unable to perform the assembler or cutter/paster positions, finding that such an individual could nonetheless perform the work of a surveillance system monitor (Tr. 348). He concluded by stating that his testimony was consistent with the information found in the Dictionary of Occupational Titles ("DOT") (Tr. 348).

### D.    The ALJ's Decision

The ALJ concluded that although Plaintiff was unable to perform her past relevant work, she could nonetheless perform a significant range of sedentary, unskilled work (Tr. 22). Citing Plaintiff's medical records, she found that Plaintiff experienced the severe impairments of "history of fracture to the left hip, possible multiple sclerosis . . . and an affective disorder," finding that although the impairments were "severe" based on the requirements of 20 C.F.R. § 404.1521, they did not meet or medically equal one of the impairments found in Part 404 Appendix 1 Subpart P, Regulations No. 4 (Tr. 15).

The ALJ found that Plaintiff retained the physical residual functional capacity ("RFC") to perform "all work activities except lift more than 10 pounds occasionally, stand and walk more than two hours in an eight hour day, perform all postural activities except

-10-

balance more than occasionally and perform work tasks that require balance while walking" (Tr. 16). The ALJ found Plaintiff's allegations "concerning the intensity, persistence and limiting effects of these symptoms . . . not entirely credible (Tr. 16).

## STANDARD OF REVIEW

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence. 42 U.S.C. §405(g); *Sherrill v. Secretary of Health and Human Services,* 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence is more than a scintilla but less that a preponderance. It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986)(en banc). In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

## FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy. 20 C.F.R. §416.920(a). The Plaintiff has the burden of proof as steps one through four, but the burden shifts to the Commissioner at step five to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

## ANALYSIS

Plaintiff argues first that the ALJ's selective and erroneous use of record evidence to support her credibility determination amounts to a distortion of the record. *Docket #10* at 5-7. Next, Plaintiff argues that the ALJ failed to explain her reasons for allotting less than controlling weight to Dr. Finch's finding that she was disabled. *Id.* at 8-9. Finally, she submits that the ALJ erred by considering her impairments "in a vacuum," rather than properly considering the effects of her mental and physical limitations in tandem. *Id.* at 9-10

(*citing Walker v. Secretary of Health and Human Services*, 980 F2d 1066 (6th Cir. 1992).

### A. Credibility

An ALJ's credibility determination is guided by SSR 96-7p, which describes a two-step process for evaluating symptoms. *See Duncan v. Secretary of Health and Human Services,* 801 F.2d 847, 853 (6th Cir. 1986). "First, the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment. . .that can be shown by medically acceptable clinical and laboratory diagnostic techniques." *Id.* Second, SSR 96-7p directs that whenever a claimant's allegations regarding "the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence," the ALJ must analyze his testimony "based on a consideration of the entire case record."

As a rule, the courts cede enormous latitude to the ALJ's credibility determinations. *Casey v. Secretary of Health and Human Services,* 987 F.2d 1230, 1234 (6th Cir. 1993); *see also Richardson, supra,* 402 U.S. at 401. An ALJ's "credibility determination must stand unless 'patently wrong in view of the cold record.'" *Anderson v. Bowen* 868 F.2d 921, 927 (7th Cir. 1989); *Imani v. Heckler,* 797 F.2d 508, 512 (7th Cir.1986). However, an ALJ's decision must contain specific reasons for the findings of credibility, supported by substantial evidence in the record. *Howard v. Commissioner of Social Security,* 276 F.3d 235, 242 (6th Cir. 2002); *Heston v. Commissioner of Social Security,* 245 F.3d 528, 536 (6th Cir. 2001).

The ALJ provided scant evidence for her conclusion that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely

credible" (Tr. 16).   Although she relied on various treating and consultive medical sources to discount Plaintiff's allegations of limitation, her selective and often erroneous application of source material amounted to a distortion of the record.

First, the ALJ noted that Dr. Fernando found "as of October 29, 2002" that "her only limitation was a mild tremor" (Tr. 17, 217-218).   Yet, Plaintiff claimed disability as of November 22, 2002, the day she shattered her hip and femur - obviously, she suffered from something more than a "mild tremor" (Tr. 13).  Likewise, Dr. Fernando's statement that an MRI, EEG, and spinal tap all showed normal results in the period *before* Plaintiff's accident does not discredit her disability claim, which arose from the accident (Tr. 17, 181).

Next, the ALJ cited consultive physician Dr. Pear's report, stating that

> "Dr. Pear noted that the claimant walked toward the office with what seemed like a relatively stable gait.  However, as she got closer to the office, she obviously exhibited some trouble with equilibrium and touched and held the wall"

(Tr. 18, 20). While the ALJ's summary of Dr. Pear's finding unfairly implies that Plaintiff exaggerated her limitations for the benefit of the consultive physician (Tr. 20), Dr. Pear's own notes do not bear out such an interpretation.  Dr. Pear, acknowledging that  Neurontin had been prescribed for poor equilibrium, noted that Plaintiff hoarded her dosage of the drug due to an inability to afford a refill (Tr. 189).  Consistent with Plaintiff's claims, Dr. Pear also observed a decreased range of left hip motion, and "considerable difficulty moving her left leg and knee onto the table" (Tr. 188).   Finally, Dr. Pear, opining that Plaintiff was "emotionally unstable," noted that her current access to mental health care was compromised

by her financial limitations (Tr. 189).  The objective medical conditions as noted by Dr. Pear, including use of Neurontin for equilibrium problems and Plaintiff's decreased range of motion, supports Dr. Pear's actual statement that "she obviously is having some trouble with equilibrium and touches and holds to the wall" (Tr. 187).  By taking Dr. Pear's observation of the Plaintiff's walking abilities out of context, and disregarding the bulk of his report, the ALJ completely distorted the true import of the consultive report.

In addition, the ALJ's statement that Dr. Shah found Plaintiff's affect "normal" despite depression and anxiety, mis-characterized the degree of limitation found by this psychiatrist (Tr. 19).  In summarizing Dr. Shah's findings, the ALJ omits mention of Dr. Shah's prognosis of "fair" along with a GAF of 45, indicating serious occupational limitations (Tr. 19, 185).  Contrary to the ALJ's conclusion that Plaintiff overstated her impairments (based on a misinterpretation of Dr. Pear's notes), Dr. Shah observed that Plaintiff "had a tendency to *minimize* her symptoms" (Tr. 184)(emphasis added).

Although the ALJ relied on neurologist Shyam Moudgil's finding that from "the neurological perspective, [Plaintiff] doesn't have any disability," this statement, accompanied by his medical source statement finding a complete absence of lifting, pushing, and postural limitations, apparently refers only to limitations as a result neurological conditions such as Multiple Sclerosis, and not to other, non-neurological limitations (Tr. 220-224).  For example, Dr. Moudgil's finding that Plaintiff did not experience *any* exertional or non-exertional limitations only make sense if interpreted to refer just to limitations as a result of a neurological condition; otherwise, it should be discounted altogether because it would be

-15-

materially inconsistent with his examination notes that showed obvious exertional limitations (Tr. 220). In fact, during the consultive exam, Dr. Moudgil observed numerous non-neurological limitations such as "antalgic gait with a limp on left," and limited range of hip and knee motion (Tr. 220).

In discounting Plaintiff's claims, the ALJ also placed great emphasis on the fact that she brought a walker to the hearing, erroneously stating that "no clinician has ever observed her using a walker," despite clear record evidence showing that Plaintiff was prescribed a walker after the November, 2002 surgery (Tr. 20, 178). Treatment notes created by Dr. Finch six months after Plaintiff's hip surgery show the continued need for a walker, stating that she continued to walk with an antalgic gait, experienced discomfort as a result of implanted hardware and was limited to walking "as tolerated" (Tr. 173).

Further, while objective medical tests arguably support the conclusion that Plaintiff was not disabled as a result of MS, these results do not imply that she did not experience disability or justify discounting her testimony. In fact, Plaintiff's allegations of work-preclusive limitations are supported by Dr. Finch's February, 2005 acknowledgment that she required immediate hardware removal and a bone graft (Tr. 259). In the same vein, Dr. Finch, noting that Plaintiff experienced pain and a "grinding" sensation at a November, 2004 exam, recommended a hardware removal as soon "as possible" (Tr. 258). That the ALJ would focus on the Plaintiff's one-time use of a walker, to the exclusion of substantial and objective medical evidence, is again indicative of her result-oriented and selective view of the record. *See Laskowski v. Apfel,* 100 F.Supp.2d 474, 482 (E.D.Mich.2000)(Lawson,

J.)("Substantial evidence cannot be based on fragments of the record.").   The ALJ, noting that both Dr. Shah  and a treating psychiatrist found that Plaintiff experienced pain when required to sit for an exam, nonetheless made the incomprehensible finding Plaintiff was capable of *unlimited* sitting  (Tr. 15-16, 20).  This unsupported conclusion also stands at odds with Dr. Pear's eyewitness statement that Plaintiff was unable to sit for more than 15 minutes (Tr. 189).

Finally, I note Plaintiff's physical and mental treating records show that her care, as well her ability to feed herself, has been consistently compromised by financial limitations (Tr. 232, 233, 251, 258, 259).   The record also shows that in October, 2003, the lack of funds obliged Plaintiff to move into trailer (Tr. 184).  While the ALJ acknowledged the horrifying fact that Plaintiff's inability to buy food caused her weight to slip to 78 pounds, she ignored the obvious inference that if Plaintiff had been capable of any work, the threat of starvation would presumably have motivated her to seek employment (Tr. 20).

For these reasons, I find the ALJ's adverse credibility determination to be fatally flawed, and not supported by substantial evidence.

### B.  The Treating Physician Analysis

Plaintiff argues next that the ALJ erred by failing to credit Dr. Finch's February, 2005 finding that complications from her November, 2002 hip surgery rendered her disabled. *Docket #10* at 8.  Citing 20 C.F.R. § 404.1527(d)(2), she submits that the ALJ neglected to give "good reasons" for declining to adopt Dr. Finch's opinion.  *Id.*

As a rule, "treating physicians' opinions, based on objective evidence, should be accorded significant weight. If uncontradicted, the physicians' opinions are entitled to complete deference." *Jones v. Secretary of Health and Human Services*, 945 F.2d 1365, 1370 (footnote 7) (6th Cir. 1991). *Wilson v. Commissioner of Social Sec.* 378 F.3d 541, 544 (6th Cir. 2004) states as follows:

> "If the opinion of a treating source is not accorded controlling weight, an ALJ must apply certain factors--namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source--in determining what weight to give the opinion."

Moreover, regardless of whether substantial evidence is found elsewhere in the record to contradict the source's findings, *Wilson* at 544, *citing* 20 C.F.R. § 404.1527(d)(2), requires that the ALJ nonetheless give "good reasons" for rejecting the treating physician's opinion.

The "disability" statement by Dr. Finch at issue here reads as follows: "At this point, unfortunately, [Plaintiff] has had disability because of the continued pain she has had in her hip" (Tr. 259). However, it is unclear whether Dr. Finch is opining that Plaintiff is disabled from all work or simply noting Plaintiff's report that she was unable to work (Tr. 259). Because Dr. Finch was not making a "disability" pronouncement, the ALJ was not required to supply "good reasons" for rejecting the opinion. To the contrary, the ALJ included a discussion of Dr. Finch's February, 2005 findings, at least concurring with the finding that Plaintiff would require additional surgery (Tr. 18).

However, as noted *supra*, Dr. Finch's February, 2005 acknowledgment that Plaintiff's

-18-

hip condition created debilitating pain requiring aggressive medical treatment supports Plaintiff's allegations of limitation. While the ALJ performed an adequate "treating physician" analysis, Dr. Finch's finding contributes to the great weight of evidence standing at odds with the ALJ's credibility determination.

### C.   The Totality of Evidence

On a related note, Plaintiff argues that the disability finding was also tainted by the ALJ's failure to consider the her mental and physical limitations in tandem. *Docket #10* at 9-10. She contends that while the ALJ relied on evidence finding non-disability as a result of either medical or mental health appraisals, none of these sources considered Plaintiff medical and mental impairments in combination. *Id.*

Courts "may not try the case *de novo,* nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler,* 745 F.2d 383, 387 (6th Cir.1984)). "However, a substantiality of evidence evaluation does not permit a selective reading of the record." *Moran v. Commissioner of Social Security,* 2003 WL 22002432, 3 -4 (E.D.Mich.2003)(Lawson, J.). "Substantiality of the evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Garner,* 745 F.2d at 387.

Consistent with this Court's finding that the ALJ's credibility analysis was not supported by substantial evidence, I agree that the failure to consider Plaintiff's impairments

in their totality constitutes error. Examples of the ALJ's erroneous credibility findings or Dr. Finch's opinion need not be repeated here. However, even Plaintiff's treating and consultive mental health records, standing alone, illustrate the need to consider the totality of Plaintiff's impairments.

A psychiatric evaluation performed in November, 2004, observing that Plaintiff had worked as a cleaner and janitor since dropping out of school in 10th grade, noted that since breaking her hip and femur, she lacked the funds to support herself or continue with needed medical treatment (Tr. 232). The same evaluator noted that Plaintiff appeared haggard, limped and fidgeted while seated as a result of pain, reporting that "[t]here is some difficulty in getting a coherent account of her life history" (Tr. 233). Likewise, a consultive examination in October, 2003 by Dr. Shah, noting that Plaintiff "was in obvious pain during the evaluation," found that her ability to function was impeded by chronic hip and back pain as well as depression and chronic anxiety (Tr. 185). While the ALJ is not bound to adopt Dr. Shah's finding of a GAF of 45, such a finding, considered alongside her physical impairments, indicates disability-level limitations.

Because the ALJ's decision is not supported by substantial evidence, a remand is required. The final question is whether to remand for further administrative proceedings and findings or to remand for an award of benefits using Plaintiff's disability onset date for calculating past due benefits. *Faucher v. Secretary of Health and Human Services*, 17 F.3d 171, 176 (6th Cir. 1994), and *Newkirk v. Shalala*, 25 F.3d 316, 318 (6th Cir. 1994), hold that it is appropriate to remand for an award of benefits when "all essential factual issues have

been resolved and the record adequately establishes a plaintiff's entitlement to benefits." *Id.* This entitlement is established if "the decision is clearly erroneous, proof of disability is overwhelming, or proof of disability is strong and evidence to the contrary is lacking. *Faucher,* 17 F.3d at 176 (citing *Mowery v. Heckler*, 771 F.2d rectification, 973 (6th Cir. 1985)).

In this case, there are few, if any, objective medical findings materially contradicting Plaintiff's allegations of disability. To the contrary, the medical evidence, viewed in its totality, strongly supports her claim. While the ALJ cited consultive and non-examining conclusions that Plaintiff is capable of gainful employment, none of these findings considered her medical and mental limitations in tandem. Considered together, these limitations strongly support Plaintiff's entitlement to benefits. *Faucher, supra.*

## CONCLUSION

For these reasons, I recommend that Defendant's Motion for Summary Judgment be DENIED, that Plaintiff's Motion for Summary Judgment be GRANTED, and that the case be remanded for an award of benefits.

Any objections to this Report and Recommendation must be filed within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with

specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the court. The response shall address specifically, and in the same order raised, each issue contained

within the objections.

s/R. Steven Whalen
R. STEVEN WHALEN
UNITED STATES MAGISTRATE JUDGE

Dated: April 11, 2008

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served on the attorneys and/or parties of record by electronic means or U.S. Mail on April 11, 2008.

s/Susan Jefferson
Case Manager