UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KELLEY A. TIMPF,

    Plaintiff,

vs.

COMMISSIONER OF
SOCIAL SECURITY,

    Defendant.
_____/

Civil Action No.
07-CV-12666

HON. BERNARD A. FRIEDMAN

## **OPINION AND ORDER ACCEPTING MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION, DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT and REMANDING FOR AN AWARD OF BENEFITS**

This social security disability matter is presently before the court on cross motions for summary judgment. Magistrate Judge R. Steven Whalen has submitted a report and recommendation (R&R) in which he recommends that defendant's motion for summary judgment be denied, plaintiff's motion for summary judgment be granted, and the matter be remanded for an award of benefits. Defendant has filed objections and plaintiff has responded.

In reviewing a denial of social security disability insurance benefits or supplemental security income, the court's role is limited under 42 U.S.C. § 405(g) to determining whether defendant's decision is supported by substantial evidence. In making this determination, the court does not review the matter *de novo*, and it may not weigh the evidence or make credibility findings. If supported by substantial evidence, defendant's decision must be upheld even if substantial evidence also would have supported a contrary decision and even if the court may have decided the case differently in the first instance.

In the present case, plaintiff claims she is unable to work because she has severe pain

and discomfort in her left hip, which was fractured when she fell in November 2002, and because she has tremors in her hands and knees and a loss of equilibrium (Tr. 117, 333). She has also been diagnosed with depression, anxiety, and bi-polar disorder (Tr. 185, 229, 289, 296). The ALJ found that plaintiff has a "history of fracture to the left hip, possible multiple sclerosis (MS), and an affective disorder" (Tr. 15). He also found that she is unable to perform her past work as a janitor, cleaner or home health aide, but that she can perform a limited range of unskilled, sedentary work (Tr. 21-22). Specifically, the ALJ found that plaintiff could work as an electronic assembler, a surveillance system monitor or a "cutter/paster," and that 1,670,839 such jobs exist in the State of Michigan (Tr. 22).[1]

In his R&R, Magistrate Judge Whalen concludes that the ALJ's decision is not supported by substantial evidence because her adverse credibility determination is based on an unfair and distorted review of the medical evidence. In this connection, the magistrate judge notes that in an effort to explain her decision to discount plaintiff's subjective complaints the ALJ, among other errors, relied on evidence predating plaintiff's hip fracture, took statements from medical reports out of context, mischaracterized other reports, and found plaintiff capable of *unlimited* sitting despite clear record evidence to the contrary. The magistrate judge notes that the ALJ erred further by failing to consider the combined effect of plaintiff's physical and mental impairments. He recommends that the case be remanded for an award of benefits, rather than for further proceedings, because the evidence strongly supports plaintiff's disability claim.

---

[1]In light of the fact that the total number of non-farm jobs in Michigan was approximately 4.3 million at the time of the ALJ's decision, *see* http://data.bls.gov/cgi-bin/surveymost, these numbers appear to have been taken out of thin air. However, given the court's conclusion that plaintiff is unable to sit long enough to perform sedentary work, the number of sedentary jobs that may exist in Michigan is irrelevant.

2

In its objections, the government "does not contest the magistrate judge's characterization of the cited evidence to the extent that the Court might conclude that it warrants remand for additional administrative proceedings." Dft's Obj. at 4. The government concedes that the ALJ's decision is not supported by substantial evidence, but urges the court to remand for further proceedings, not for an award of benefits, essentially because (1) "Plaintiff is only 37 years old.... [O]nce she is receiving benefits she will continue to receive them for decades, absent evidence of medical improvement such that she is no longer disabled"; and (2) "while the evidence of disability may be strong, the evidence to the contrary is not lacking to the degree the magistrate judge suggests." *Id.* at 3, 5.

Regarding the first objections, plaintiff's age is irrelevant. If she is unable to work, she is entitled to benefits. The suggestion that the claim of a 37-year old should be subjected to more exacting scrutiny than that of an older claimant is outlandish. The court rejects this objection outright.

As for the second objection, defendant concedes that the ALJ's decision is not supported by substantial evidence. Therefore, the only remaining issue is whether the case should be remanded for an award of benefits or for further proceedings. "A judicial award of benefits is proper only where the proof of disability is overwhelming or where the proof of disability is strong and evidence to the contrary is lacking." *Faucher v. Sec'y of Health and Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994), *citing Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985). In the present case, defendant further concedes that "the evidence of disability may be strong" but argues that "the evidence to the contrary is not lacking to the degree the magistrate judge suggests." Dft's Obj. at 5. Having reviewed the entire administrative record, the court agrees with the magistrate judge that

in this case evidence undermining plaintiff's disability claim is indeed lacking.

The government contends that "evidence to the contrary is not lacking to the degree the magistrate judge suggests" because "[t]he record contains medical opinion consistent with the ALJ's decision." *Id.* For support, defendant points exclusively to the fact that "psychiatrist Dr. Oberlander, the medical advisor at Plaintiff's administrative hearing, testified that Plaintiff could perform simple, unskilled work." *Id.* at 5-6. Yet Dr. Oberlander is a Ph.D. psychologist (Tr. 90), not a physician (Tr. 343), and he testified solely about plaintiff's *mental* impairments. His testimony was that plaintiff "retains the capacity to perform simple, unskilled work. Now this is totally excluding the non-mental impairments" (Tr. 345). As plaintiff's claim is based predominantly on her *physical* impairments, it is absurd for defendant to cite Dr. Oberlander's testimony as the "medical opinion consistent with the ALJ's decision." Dft's Obj. at 5.

The fact of the matter is that the record contains almost no evidence to support the ALJ's decision that plaintiff is physically capable of performing sedentary work. As the magistrate judge correctly notes, the ALJ's finding that "[n]o limitation is being placed on her ability to sit" (Tr. 20) is incomprehensible.[2] There is no dispute that plaintiff fell and broke her hip in November

---

[2]In the preceding sentence, the ALJ stated: "Given her hip and knee complaints, a limitation to occasional postural activities, such as stooping, crawling, climbing, etc. is reasonable" (Tr. 20). Why the ALJ thought it relevant to comment on plaintiff's inability to stoop, crawl or climb is unknown, as these abilities have nothing to do with sedentary work. "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. . . ." 20 C.F.R. § 404.1567(a). The ALJ also included these "limitations" in her hypothetical question to the vocational expert (Tr. 347). The ALJ found no other limitations affecting plaintiff's ability to sit and, as noted, specifically found that "[n]o limitation is being placed on her ability to sit" (Tr. 20).

4

2002. In the ALJ's words, plaintiff "underwent gamma nail fixation of the fracture" (Tr. 17).[3] Nor is there any dispute that plaintiff's hip has healed (Tr. 18, 259). However, the evidence also plainly shows that the "hardware" (i.e., pin, nail and screws) have never been removed. Plaintiff's treating physician, Dr. Joseph Finch, noted in a report dated November 23, 2004 (two years after her fall) that plaintiff complained to him

> that she is having ongoing and increasing pain in her left hip, especially over the trochanter. She has pain when she lays on her side or sits for a long periods of time and she complains of a crepitation or "grinding" over this area. This has been going on for the better part of a year. She states she has been unable to work because of the pain in her hip and she has lost a significant amount of weight.
>
> * * *
>
> X-rays of her hip and femur revealed complete healing of the subtrochanteric femur fracture with hardware in place. The hardware is up over the trochanter approximately two centimeters.
>
> Impression: Retained symptomatic hardware, left hip with healed subtrochanteric left femur fracture.

(Tr. 258.) On examination, Dr. Finch detected "crepitation over the trochanter" (Tr. 258). He indicated that "the solution to her problem with the continued pain that she is having is to remove the hardware" (Tr. 258). However, he also noted that plaintiff "does not have insurance" and that "[s]he will contact me with any further decisions that are made as far as her insurance and health care goes, and we will schedule her for a hardware removal as soon as possible" (Tr. 258). In a

---

[3]The operative report, which characterized plaintiff's hip fracture as "complex," described the operation as "Gamma nail fixation of the left subtrochanteric intertrochanteric hip fracture utilizing a 130 degree x 340 mm gamma nail and 85 mm lag screw" (Tr. 167). The procedure involved the installation of a "gamma nail," a "Steinmann pin," a "lag screw" and a "set screw" (Tr. 168).

letter to plaintiff's counsel in February 2005, Dr. Finch repeated his opinion that "[i]t was mostly the hardware that was causing her pain. I feel that she would benefit from the hardware removal and this should take care of the problems that she had. She will probably need a bone graft at the same time of her hardware removal" (Tr. 259). Nothing in Dr. Finch's reports suggests that he doubted plaintiff's subjective complaints.

Plaintiff testified that she could sit for only 30 to 40 minutes before having to lie down for two to three hours to allow her pain to subside, that she can sleep only two to three hours at night before the pain in her left hip and left leg awakens her (Tr. 325-27). As the magistrate judge has demonstrated, the ALJ offered no principled reason for disbelieving this testimony. In light of Dr. Finch's verification regarding the cause of the pain, the ALJ's adverse credibility determination is all the more perplexing.[4]

The vocational expert acknowledged that no work exists for a person who must lie down during the day (Tr. 349). Given the fact that plaintiff's stated need to lie down is not contradicted, and in fact is supported by Dr. Finch's reports that plaintiff's pain is caused by the unremoved "hardware," the record contains no evidence that jobs exist which plaintiff can perform.

While plaintiff's severely limited ability to sit is dispositive of this claim, the court

---

[4]Plaintiff's subjective complaints are further supported by Dr. Erwin Pear, M.D., who examined plaintiff at defendant's request in September 2003 (Tr. 186-89). Dr. Pear included as part of his "impression" that since breaking her hip plaintiff has complained of pain and has had a limited ability to walk, stand and sit. Dr. Pear indicated that plaintiff "can only sit for about 15 minutes, then she starts to fidget and is uncomfortable" (Tr. 189). In December 2003 a non-examining DDS physician checked a box on a residual functional capacity form indicating that plaintiff can sit for six hours during an eight-hour work day (Tr. 210). However, this opinion is entitled to no weight, as the same physician indicated on the same form that plaintiff's symptoms, as alleged by her, are "consistent . . . with the total medical and nonmedical evidence. . . ." (Tr. 214).

feels compelled to comment on another aspect of this case which the ALJ sloughed off as unimportant, namely, plaintiff's weight loss. The ALJ's sole comment in this regard is: "The only lingering issue is a huge weight loss the claimant sustained and the family's suspicion of anorexia. However, treatment notes most recently submitted (Exhibit 17F) do not indicate anorexia or any other long-term difficulty" (Tr. 21). The record does not contain an Exhibit 17F. Presumably the ALJ was referring to Exhibit 16F (Tr. 280-303), as these are records submitted by plaintiff's counsel after the administrative hearing at the ALJ's invitation (*see* Tr. 106, 280) and would therefore be the "treatment notes most recently submitted." These records, from Monroe Community Mental Health Authority, consist of four "medication reviews," which indicate that plaintiff was being treated for depression and anxiety. These records make no mention of plaintiff's weight loss, except to note that plaintiff's mother "wanted her to go to the hospital because her weight is down to 79 pounds" (Tr. 282). It is perplexing in the extreme that the ALJ would point to these mental health records, which have nothing to do with plaintiff's weight loss, as evidence that plaintiff does not have "anorexia or any other long-term difficulty" (Tr. 21).

If the court were remanding this matter for further proceedings, it would require the ALJ to develop the record regarding this obviously significant aspect of plaintiff's physical health. Plaintiff, whose height is 5 feet 2-1/2 inches (Tr. 187, 219), weighed 109 pounds in October 2003 (Tr. 184), 87 pounds in November 2004 (Tr. 219), and 79 pounds in February 2005 (Tr. 323). Plaintiff characterized her weight loss as "rapid" (Tr. 323), and Dr. Finch found the amount of weight loss to be "significant" (Tr. 258). According to the Dietary Guidelines for Americans issued by the Department of Health and Human Services in 2005, the "healthy weight range" of a person

7

of plaintiff's height is 104 to 135 pounds.[5] At 79 pounds, plaintiff weighs only *three-quarters* of the *lowest* healthy weight for her height. Whether plaintiff is on the verge of starvation as suggested by the magistrate judge, the court cannot say. But it is shocking that the ALJ, who conceded plaintiff's weight loss is "huge," would have nothing more to say about this issue except to characterize it as "lingering" and then dismiss it on the grounds that unrelated mental health records show no "long-term difficulty" (Tr. 21).

For the reasons stated above, the court concludes that defendant's decision in this matter is not supported by substantial evidence. The court also concludes that remand for an award of benefits is warranted because "proof of disability is strong and evidence to the contrary is lacking." *Faucher, supra,* 17 F.3d at 176. Accordingly,

IT IS ORDERED that, over defendant's objections, Magistrate Judge Whalen's Report and Recommendation is hereby accepted and adopted as the findings and conclusions of the court.

IT IS FURTHER ORDERED that defendant's motion for summary judgment is denied.

---

[5]The range for a person 5'-2" in height is 104 to 131 pounds. The range for a person 5'-3" in height is 107 to 135 pounds. *See* http://www.health.gov/dietaryguidelines/dga2005/document/html/chapter3.htm, Fig. 2 (Adult BMI Chart).

IT IS FURTHER ORDERED that plaintiff's motion for summary judgment is granted, and that this matter is remanded for an award of benefits.


s/Bernard A. Friedman
HON. BERNARD A. FRIEDMAN
CHIEF UNITED STATES DISTRICT JUDGE

Dated: May 12, 2008
Detroit, Michigan


I hereby certify that a copy of the foregoing document
was served upon counsel of record by electronic and/or first-class mail.

s/Carol Mullins
Case Manager to Chief Judge Friedman